UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID AMORY                          :          CIVIL ACTION NO.

VS.                                  :          3:15-cv-01535 (VAB)

JOETTE KATZ,
MICHAEL D. DAMICI,
TOWN OF NEW MILFORD,
SHAWN M. BOYNE,
PETER M. DELOUIS,
JAMES M. MULLIN,
Defendants                           :          APRIL 19, 2016

## AMENDED COMPLAINT

## I.    PRELIMINARY STATEMENT

1.      This is a civil rights action, pursuant to 42 U.S.C. § 1983, in which plaintiff seeks damages to redress the deprivation, under color of law, of rights secured to him under the Constitution and law of the United States and the State of Connecticut. Plaintiff seeks damages for false arrest, malicious prosecution and fabrication of evidence against the New Milford police, for an incomplete, misleading and biased investigation and a Monell count for failure to train in how to investigate reports of sexual abuse by children, including failure to train in the Child First and/or RATAC protocol, how to observe forensic interviews, failure to train in taint of child disclosures, suggestibility of children, peer contamination, interview bias, and reliability of disclosures by the New Milford Police Chief and the Town of New Milford; and against Katz, as Commissioner of DCF for unconstitutional policies in using biased and leading forensic interviews and for failure to train in (among other things) taint of child disclosures, suggestibility of children, peer contamination, interview bias, and reliability of disclosures, failure to  supervise, and against social worker Damici for a woefully inadequate investigation.

## II.    PARTIES

2.      Plaintiff **David Amory**, during all relevant times, was a citizen of the United States, residing in the State of Connecticut in Brookfield.

3.      Defendant **Joette Katz** served as the Commissioner of the Department of Children and Families ("DCF") at all times relevant to this Complaint, and is sued only in her individual capacity and as Commissioner. DCF is an agency of state government and is located at 505 Hudson Street, Hartford, Connecticut, 06106. DCF is authorized by Connecticut State law to investigate reports of child abuse and neglect and to care for children in DCF's custody.

As Commissioner of DCF, defendant Katz was responsible for making and/or approving policies for DCF, including policies regarding the investigation of alleged child sexual abuse and neglect, and the training and supervision of employees in DCF.

1

As Commissioner of DCF, defendant Katz was responsible DCF's compliance with the Constitution and the statutes, regulations, and common law of the United States and the State of Connecticut.

Defendant Katz had a duty to plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. Defendant Katz also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all DCFs agents, officers, employees and those acting under them so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of plaintiff in order to avoid causing the injuries and damages caused herein.

4.      Defendant **Michael D. Damici**, during all times relevant to this action, was employed as a social worker for DCF, assigned to its Danbury office. He is sued only in his individual capacity.

5.      Defendant **Town of New Milford** is a municipality in the state of Connecticut and owns, operates, manages, directs and controls the New Milford Police Department, which employs defendants Boyne, DeLouis and Mullen.

6.      Defendant **Shawn M. Boyne** is and was at all times relevant to this Complaint, police chief of the New Milford, Connecticut Police Department. He is sued only in his individual capacity.

7.      Defendant **Peter M. DeLouis**, during all times relevant to this Complaint, was a detective in the New Milford, Connecticut Police Department, acting in and during the course and scope of his duties and functions as a New Milford police officers, and/or while he was acting as agent and employee of the defendant Town of New Milford. He is sued only in his individual capacity.

8.      Defendant **James M. Mullin**, during all times relevant to this Complaint, was a detective in the New Milford, Connecticut Police Department, acting in and during the course and scope of his duties and functions as a New Milford police officers, and/or while he was acting as agent and employee of the defendant Town of New Milford. He is sued only in his individual capacity.

9.      During all times mentioned in this complaint, the defendants were acting under color of law, that is, under color of the constitution, statutes, law, rules, regulations, customs and usages of the State of Connecticut.

10.      At all times mentioned in this Complaint, the defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect the plaintiffs from the unlawful actions of the other defendants but each defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

### III.    STATEMENT OF FACTS

11.    In 1996, David Amory opened a children's sports instruction business, Top Flight Sports Center, with his former wife. In 2003, they added a childcare program. In 2005, Amory and his wife divorced. Amory took out a large loan to buy out her share of their assets. The business and real estate values at the time were wildly inflated. Over the next few years these values plummeted. Over the next seven years, Amory's business experienced a 30% decline in the local child population and the worst recession since the 1930's. These factors greatly contributed to a 45% drop in revenue until 2012, when the business finally closed.

12.    During this same period, Amory became the primary caregiver for his two children (7 and 9 years), whose mother had moved away to start a new family. Amory was forced to increase staff and payroll so that he could care for his children. Between 2007 and 2009, Amory sold his home, boat, truck and most other assets. Amory and his children moved from a 2000 square foot home into a 600 square foot apartment. In 2010, Amory's son graduated the 8th grade from Sherman School and began attending high school near his mother. CT DPH changed the staff ratios required for childcare programs. To save on payroll, Amory began assisting with the childcare program.

13.    In 2011, Amory was accused of inappropriately touching a 7 year old girl. The Department of Public Health ("DPH") claims to have substantiated the accusation, despite producing no evidence. In a clear violation of Amory's right to due process, DPH posted a notice of the substantiation on their public website. Amory's former legal advisors were unaware of this DPH public notice. Despite having contact with officials at DPH, DCF and local law enforcement, Amory did not receive any notification that the DPH substantiation would be posted on their public website.

14.    In 2012, another complaint of inappropriate touching was made, a result of the prior complaint that was now on the DPH public website. A video surveillance tape at the time provides no proof of the accusation. Additional staff that were present at the time reported seeing nothing unusual. On June 29, 2012, Amory was coerced into signing a statement of license surrender. Again, the signed statement was made public and appears in news articles thereafter.

15.    From June 28-8/2/2011, A.L. (born 2003, age 7 at time of disclosure) and her brother R.L. attended Top Flight Summer Camp.

16.    On 8/3/2011, Mrs. L. called to say her kids would not be at summer camp because of poison ivy.

17.    On 8/4/2011, the L. parents contacted the New Milford Police Department ("NMPD"), and a report was made to DCF.

18.    On 8/9/2011, DCF and DPH arrived at Top Flight Summer Camp unannounced to investigate an allegation of sexual abuse by David Amory. Six staff members and six campers were interviewed while all programs continued operating. Top Flight attendance records and

camper contact information was provided. No written details of the allegation were provided to Top Flight.

19.     People interviewed by DCF on 8/9/2011
Staff: Amory, Kelly Hall, Jen Benedict, Katie Kelly, Lydia Morales, Stephanie Thibodeau
Campers:  H.S., K.M., A.W., P.C.
DCF requested parent contact info on 8/12/2011 for C.W. and B. W.

20.     From 8/10/2011 forward, Amory was only scheduled to help with school buses arriving to and departing from Top Flight childcare. He had no direct supervision of children.

21.     On 8/10/2011, a CAIT forensic interview of A.L. was conducted by Diane Edell.

22.     In October 2011, S.B. and her brother A.B. attended their last day at Top Flight after school program. Christian B. (father) was now working from home now.

23.     In November 2011, DCF sent a notice of substantiation of abuse as to A.L. This substantiation was later dropped. This reflects DCFs improper policy of substantiating at the drop of hat, without sufficient evidence to support placing on the Central Registry, which ruins lives often due to woefully inadequate investigations by DCF employees.

24.     On 11/9/2011, Top Flight received written notice from DPH of substantiation of abuse. The notice provides a simply summary with no specific details as to where or when any abuse occurred. Top Flight retained Attorney Amy Klein, a child welfare specialist. On 11/18/2011, Amory and Jen Benedict gave interviews to NMPD with Attorney Randy Breeckner present.

25.     Jennifer Benedict came to the New Milford Police Department. Benedict's statement included the following: She has worked at Top Flight since 1996 and has been Director of Operations since 2000. Benedict remembered Amory reading to Avery and 3 or 4 other children in the summer of 2011 along with employee Katie Lesiak. Benedict said Amory was never alone with any kids, including Avery and that the reading took place in an open area in clear view of anyone who was in the building. Benedict said she never saw Amory touch A.L. or any other kids.

26.     On 12/6/2011, Top Flight received notice of Childcare license violations stemming from the allegation and an opportunity for a compliance meeting. Attorney Klein contacted DPH to schedule a meeting.

27.     On 12/22/2011, Top Flight received notice of scheduled compliance meeting in Hartford, CT for 1/11/2012.

28.     On 1/11/2012, Attorney Klein and Amory met with DPH. At the meeting, no further details of the allegations were provided. DPH provided no evidence, not even the results of staff and camper interviews. Amory is asked to speculate about the cause of the allegation. At this point, Top Flight is entitled to a formal hearing that would require DPH to provide evidence and set a time frame for a decision. Attorney Klein decides to forgo a hearing and instead wait for a

decision from DCF. Attorney Klein agrees to draft a temporary licensing corrective action plan (LCAP) for Top Flight to show steps taken to protect children. Notes from the DPH meeting indicate that this was a temporary plan to be in place until DPH made a final decision. The assumption was that DPH would make a decision within 60 days.

29.     On 1/13/2012, Attorney Klein sent licensing corrective action plan to DPH and Attorney Breeckner. On 1/13/2012, Amory and Top Flight childcare director Jen Benedict met to discuss the LCAP. On 1/14/2012, the Top Flight staff schedule was modified so that Amory was no longer helping with bus arrivals and departures. He was only performing administrative duties. This continued for the remainder of the year. Jen Benedict confirmed this in a DCF witness statement on 6/25/2012. On 1/16/2012, DPH acknowledged receipt of corrective action plan.  On 1/16/2012, Top Flight held a staff meeting to discuss changes to the staff schedule

30.     In March 2012, S.B.'s mother called to say the kids would not be attending the afterschool program anymore. She says the kids enjoyed their time at Top Flight and thanked Amory for the program.

31.     On 3/7/2012, DPH did an unannounced inspection at Top Flight, which lasted four hours and during which DPH thoroughly reviewed all Top Flight business records. The inspector would have asked Jen Benedict about the compliance with the LCAP.

32.     On 3/8/2012, the Report from Detective Mullin on the NMPD stated: "After discussing this case with the CAIT team it was decided that the case did not have enough evidence or probable cause to proceed to the next level. It was agreed that the case would be closed pending new information or evidence." (Ref: 11-15274-OF).  On 3/9/2012, Jen Benedict and Amory met with Attorney Klein to discuss the LCAP, new employee handbook, staff training and the DCF hearing.

33.     On 3/14/2012, a meeting with DCF was held which Amory and Jen Benedict attended with Attorney Klein. DCF reversed substantiation, DCF case is closed with no finding of abuse. On 3/15/2012, DCF reversed substantiation for sexual abuse/exploitation – substantiated for emotional neglect of A.L. DCF sent notice of results of meeting.

34.     On 3/20/2012, Top Flight installed 11 camera video surveillance system. On 3/28/2012, DCF Hearing Officer James Malcolm sent a letter confirming that Amory was no longer on the Central Registry.

35.     On 4/2/2012, Attorney Klein sent DPH the results of the DCF meeting. In April 2012, Amory met with Attorney Breeckner and NMPD. Detective Mullin to verify installation of 11 camera video surveillance system. Shortly after, the NMPD case was closed with no finding of abuse.

36.     **M.M. – A.L. Connection**
M.M. began attending Top Flight after school program on April 30, 2012. M.M. was placed into a group with T.B. (girl) and J.B.. Three girls and seven boys. The "B" family was friends with

the L. family. J.B. and R.L. were best friends. The "B" and "L." children attended Hill & Plain School and Top Flight childcare

37.     M.M. began attending Top Flight after school program on 4/30/2012, seven weeks before the allegation.

38.     From April to 5/17/2012, Attorney Klein contacted DPH numerous times to inquire if a final decision had been made. Emails confirm this. On 5/16/2012, Attorney Klein sent another copy of DCF meeting results to DPH.

39.     DPH compliance meeting summary further indicates the agreement restricting Amory's contact with kids was temporary. Emails from Attorney Klein show multiple attempts to get a final decision form DPH as late as 5/27/2012, 10 months after the initial investigation concerning A.L..

40.     On 5/18/2012, S.B. attended Top Flight Kids Night Out.  S.B. attended Top Flight Summer Camp, which was held 6/18 to 22/2012. M.M. also attended summer camp.

41.     By 6/20/2012, there is still no final decision from DPH. It was now 160 days after the meeting with DPH and 310 days after the initial investigation.

42.     On 6/21/2012, Top Flight Summer Camp counselor Danielle Cox was not able to work because of a schedule conflict. No substitutes were available. Jen Benedict agrees to supervise Danielle's group in addition to her other responsibilities. At 12:00, Jen has fallen behind on her camp director responsibilities, and asked Amory if he could fill in for her 40 minutes so that she can get caught up. Amory agreed to take his lunch break in the blue room with staff member Brandi Piskura and 13 campers to maintain proper ratio. The campers are watching a movie.

43.     At approximately 12:15 Amory went into the Blue Room and sat by himself at a table to eat lunch. The children were on mats on the floor watching a movie. The other staff member in attendance was Brandi Piskura. At 12:30, Amory moved to sit next to Ms. Piskura at the table while the campers were still on their mats. It was very hot that day. The air conditioning in the building was struggling to keep the building cool. The movie apparently was not very good and the campers started to get restless. At approximately 12:40 p.m., some of the kids got off the mats and come over to the table where Piskura and Amory were sitting. Among the other campers who came over were R.D., M.M., and B.M., M.M. sat next to Amory on his right side, and R.D. sat next to Piskura. R.D., after a short period of time then moved to sit on Piskura's lap after which M.M. move and sat on Amory's right leg/lap area. Amory had his right arm around M.M.'s rib area so that she would not fall.

44.     At approximately 12:55, B.R. asked to use the boy's room. One staff member must always go with the camper to the restroom and stand outside for safety and security reasons. Amory got up from the table and went with B.R. until he finished and returned to the room. The movie ended shortly after that and Amory went back to the Front Desk and continued his normal duties. At no point was Amory every alone with the children. Brandi Piskura maintained visual and verbal contact with all campers at all times. The room was under 24 hour video surveillance.

6

All activity in the room was clearly visible by parents and other staff through large tempered glass windows along the main corridor of the facility.

45.     Blue Room attendance sheet for 6/21/2012, lists staff & campers
Staff: Jen Benedict, Brandi Piskura, David Amory, Stephanie Thibodeau.
Campers: M.M., B.R., B.M., R.D-W, C.M., N.V., K.M., S.O'B., F.C., S.P., K.S.

46.     On 6/21/2012, M.M. did not say anything at all while in the blue room watching the movie from noon to 1 pm. It was not until 4:30 pm, when M.M.'s step-father came to pick her up, that M.M. blurted out a very odd "disclosure" that was not in keeping with M.M.'s conduct and actions that entire afternoon at Top Flight and in the blue room.

47.     Around 6 pm, Jen Benedict called M.M.'s mother, Heather M. n/k/a/ Prusakowski. Heather told Benedict that she did not know how to approach her daughter's "disclosure" and was going to ask M.M.'s therapist to see how she should go about it. So obviously, M.M. was being treated for a pre-existing condition.

48.     Top Flight self-reported incident to DCF. DCF received a child abuse and neglect report on 6/21/2012 as to M.M.

49.     On 7/9/2012, the NMPD received from the Department of Public Health, a DVD recording of the "Blue Room" at Top Flight Gymnastics Center. The recording is from 6/21/2012, and runs from 12:19 p.m. and goes to 1:00 p.m. The DVD recording was seized and marked as evidence (12-600-PR).

**Missing Exculpatory Evidence**

50.     On 6/25/2012, a **3 week Video Surveillance Tape** was made available to New Milford police Detective Mullin by Jen Benedict.

51.     Missing surveillance video is very relevant here. The other cameras would have shown Piskura standing right outside the Blue room. The other cameras would have shown the parents and staff that were looking into room.  There are pictures of the blue room with kids watching a movie. It is clear how visible, transparent and open all areas are. The other cameras would have shown M.M.'s behavior during the rest of the day. This was all lost because NMPD did not preserve it.

52.     On 6/25/2012, New Milford police department was notified. On 6/25/2012, Top Flight was investigated by NMPD, DCF and DPH.

53.     **Missing Exculpatory Evidence regarding M.M.**

54.     The following is a list of exculpatory evidence given to New Milford Police investigators that can be verified by the people who were interviewed by Litchfield Investigative Services (John Pudlinski), which documents include Top Flight business records.

- 6/25/2012 – Documents Given To – NMPD – Jim Mullin by Jen Benedict
  - Summer Camp Attendance Records
  - Top Flight Staff Contact Information
  - Staff Schedule
  - List of 13 Campers in Blue Room on 6/21/12
  - List of Campers who were friends with M.M.
  - List of Staff who supervise M.M.

- 625/2012 – **3 week Video Surveillance Tape** made available to –NMPD – Jim Mullin by Jen Benedict

- June-July 2012 – Interviews by NMPD – Jim Mullin
  - Heather Prusakowski - mother
  - Dan Prusakowski - stepfather
  - Michael M. - father

55.    **DPH Surrender of License – Chronology of Events**

On 6/26/2012, at1:30 p.m., Sandra L. Lok, Child Care Licensing Supervisor, Department of Public Health, contacted Amory. Lok told Amory that the State had begun the process of revoking his license. Amory could no longer operate the Summer Camp until the investigation was completed. Lok recommended that Amory voluntarily surrender the Top Flight Child Care license. Amory asked if Top Flight could remain open until Friday, 6/29/2012, so that families could have time to make other arrangements for childcare. Lok agreed so long as Amory sign a statement agreeing to remain off the property. Lok said the agreement had to be signed that day. Amory told Lok he needed to think about it and would get back to her by 3 p.m.

6/26/2012 2:00 pm. Amory spoke with Jen Benedict, who agreed that the State wanted to shut Top Flight down, that they should surrender the license and sign the agreement to remain off the property so that they could remain open until Friday.

6/26/2012 3:00 pm. Amory called Lok back to tell her he would agree to surrender the license. Lok said that she would send a DPH employee with the letter to Top Flight for Jen Benedict to sign and then to Amory's home for him to sign. Lok said it must be signed by that day.

6/26/2012 8:00 p.m. A DPH employee showed up at Amory's house with the letter. The letter obviously contained much more than just an agreement to remain off the premises. If Amory refused to sign it then he must immediately call 50 families to inform them Top Flight would not open 6/27/2012, 11 hours from that point. Amory also held out a false hope that Jen Benedict would be able to get a daycare license under her name so Top Flight could continue to operate. If Amory refused to cooperate then he felt it would hurt his chances of that happening. Amory reluctantly agreed to sign.

6/27/2012 DPH posted the signed surrender of license agreement on its website. Anyone could now view and share the document. News articles referred to this document many times.

Lok did not inform Amory during their conversations at 1:30 p.m. and 3:00 p. m. that the document Amory was signing would be made public, that Amory was giving up his right to a hearing, and that he would be admitting to violations of DPH regulations. Amory was not sent a copy of the letter to review before the DPH rep showed up at 8 p.m. There was no reason that Amory had to sign THAT day and there was no reason that Top Flight could not be allowed to remain open until Friday unless Amory signed the surrender of license statement that day.

56.    On 6/27/2012, Top Flight announced closing of summer camp as of 6/29/2012.

57.    On 6/29/2012, CAIT Interview of M.M., (born 2005, age 7), at Charlotte Hungerford Hospital Center for Youth and Families; interviewer was Danielle Williams. The academic background of Danielle Williams is that she had a Ph.D. in leadership – Williams was not licensed as a psychologist and did not have the credentials to conduct a forensic investigation of child abuse. Ms. Williams is not a psychologist but a licensed professional counselor.  Another troubling fact is that Ms. Williams had only been licensed as a professional counselor since 9-7-2011. (Dept. Pub. Health e-licensing) The weight that should be given to the opinion of Ms. Williams should have been minimal given Ms. Williams' lack of experience. License information for the State of CT, dated 9/20/2012, indicates that Danielle Williams was a licensed professional counselor, a license with far lower requirements for education and training than a licensed psychologist. Her license had been active since 9/7/2011. Less than one year before the CAIT interview.

58.    RATAC forensic interview protocol focuses on the presence of bias or neutrality in questioning. A widely accepted and highly recommended safeguard against interviewer bias is the exploration of alternative hypothesis. In a forensic interview, alternative hypothesis questions are asked to explore alternate explanations for a child's reported experience. Ms. Williams did not follow proper protocol for the forensic interview.

59.    It is also noteworthy that CAIT is not an independent, objective organization but funding is through the Governor's Task Force, which gets federal funding. There is a common underlying theme throughout this matter regarding funding issues, and possible bias and motive to take certain actions and draw certain conclusions so as not to bite the hand that feeds you.

60.    Observers: detective Peter DeLouis, New Milford Police and Michael Damici, DCF Danbury. Anatomical dolls were used during the CAIT interview, which Bruck says is no longer proper protocol. Defense expert witness Dr Maggie Bruck has testified that the use of anatomical dolls and drawings is no longer proper protocol.

61.    The CAIT Forensic Report by Danielle Williams notes that M.M. is currently in therapy and will continue with the current therapist.

62.    It is noteworthy that no questions are asked as to what M.M. is in therapy about. It would be important if she had reported issues of sexual touching by others and was "acting out" with Amory. It is clear from watching the DVD of the blue room on 6/21/2012 that of all the kids in that room, M.M. was climbing all over Amory. M.M. was even draping her arms around Amory's neck. M.M. displayed these actions, in plain view of everyone. This should have been

obvious to anyone watching the DVD of the blue room, had the viewers not had a witch hunt mentality and automatically assumed the guilt of the "perpetrator."

63.     **Observations from M.M.'s forensic interview**

Forensic Interview notes:
A.      Report states that there was NO prior DCF history. M.M.'s natural father Michael M. was arrested and found guilty of assaulting M.M.'s mother Heather. Michael M. lost all custody rights to M.M.. How could there not be any DCF record of that?
B.      Summary: Again states M.M. was on Amory's lap. But in fact she was straddling his right leg.
C.      Footer note: The recorded interview was NOT reviewed before making a report. Why not? This is a serious allegation with no physical evidence or witnesses confirming M.M.'s story.

64.     **M.M. - Interview Observations**

Date of Interview: June 29, 2012          Date of Alleged Incident:   June 21, 2012
Interviewer: Danielle Williams.          Present: Peter DeLouis, Michael Damici

A.      When asked by the interviewer who she spoke to about the alleged incident, M.M. does not mention informing staff members Brandi Piskura or Jessica Bieber.  It is only after the interviewer brings this up later that she says something.  This was significant because if she believed something wrong actually did happen it should have been difficult for her to speak to Brandi & Jessica as opposed to just waiting until she got home. The decision to say something to the staff should have left more of impression on her.  This reinforces the belief she was merely making up a story to get a reaction from Brandi, Jessica or the other campers.

B.      M.M. does not mention speaking to her therapist at all.

C.      The dramatic language M.M. used to describe the alleged incident to Jessica Bieber such as "wanting to call 911" was very different from how she described things in her taped interview.

D.      M.M. demonstrates with the dolls that Amory allegedly touched her with his left hand. She was sitting on his right leg as the video shows. This would have been easily visible to both Brandi and R.D. who were sitting to his left.  The surveillance tape clearly shows M.M. moving to Amory's lap AFTER Brandi sits down next to him.

E. M.M. again demonstrates with the dolls how Amory allegedly touched her by lifting up the skirt of the doll and touching the crotch. The surveillance tape shows M.M. wearing shorts and not a skirt.

65.     On 7/5/2012, Brandi Piskura gave a statement to the New Milford police

"I've been working at Top Flight for a little over a year. On Thursday, June 21, I brought my group of kids, 10+, into the "blue room" to watch a movie around 12. Dave came in also. About halfway through the movie, M.M. sat on the bench with Dave and I. The seating arrangement

was me, R.D. (a five-year-old girl), Dave and M.M. sat on Dave's right knee. I didn't notice anything unusual, she didn't seem uncomfortable, nervous, etc. I didn't hear her say "stop," "no," anything indicating she was upset. During the movie she did get up from his lap to sit back on the floor and then returned to his lap later on. The movie ended at 1 and for the remainder of the day, M.M. behaved normally. However, when her step father came to pick her up, she quickly told me "during the movie Mr. David rubbed my private area" and gestured between her legs. She didn't seem worried or troubled when she told me this. When M.M. got off Dave's lap, I was standing in the doorway to maintain ratio while another child used the bathroom. I do not know why she got up.

66.  On 7/16/2012, Top Flight announced closing doors on 8/4/2012.

67.  On 7/23/2012, Danbury News Times published an article with the DPH letter.

68.  7-23-12 Embattled sports center to close – News Times

NEW MILFORD -- Amid state and local investigations into allegations of physical and sexual abuse, the Top Flight Sports Center at 17 Pickett District Road has announced it will close Aug. 5, at the end of its summer classes. "Regretfully, Top Flight has made the tremendously difficult but necessary decision to close its business effective Aug. 5, 2012," reads an announcement posted on Top Flight's website. "We have made a lot of friends and memories over the years, and we thank each of you for making Top Flight such a great and fun place to be," according to the announcement. Officials at the sports center initiated the investigation in June with the state Department of Public Health, which licenses child care facilities. The state Department of Children and Families was notified, and the New Milford Police Department became involved. On June 29, Top Flight voluntarily relinquished its child care license and shut down the child care part of the business, as well as its summer camp operation.

In giving up the license, David Amory, listed in official documents as the legal representative for Top Flight Gymnastics Center Inc. and the holder of the child care license, signed the following statement: "I understand and agree that I, David Amory, legal representative for the operator, shall remain out of the facility, off the premises, and off the property at 17 Pickett District Road, New Milford, Conn., until after the close of the center on June 29."

Phone messages left for Amory were not immediately returned Monday. Nor were calls to other staff members. New Milford police confirmed its detectives are continuing to investigate allegations of abuse, but no arrests have been made. In the formal announcement on the Top Flight website, the center's management wrote that financial constraints caused by the closing of the child care center and summer camp "have made it impossible for the remaining programs to continue." The announcement made no mention of the ongoing state and local investigations.

On Facebook, several parents lamented the loss of the facility, which also provided gymnastics and martial arts classes, swimming lessons, and a recreational space called Planet Play with inflatables and obstacle-type equipment.

69.     In late July 2012, Fox News CT had two stories about alleged abuse at Top Flight.

70.     While Amory was asked to remain off Top Flight's premises Channel 4 Fox News arrived with a camera crew on 2 different occasions and confronted martial arts director Sean Jugler and aquatics director Margaret Johnson about the allegations of abuse.

71.     On 8/1/2012, a second news article with DPH letter ran in the Danbury newspaper.

8/1/12 Top Flight Sports Center to close shop – News Times

Amid state and local investigations into allegations of physical and sexual abuse, the Top Flight Sports Center at 17 Pickett District Road in New Milford will close Sunday, Aug. 5, at the end of its summer classes. "Regrettably, Top Flight has made the tremendously difficult but necessary decision to close its business, effective Aug. 5, 2012," reads an announcement posted on Top Flight's website.

"We have made a lot of friends and memories over the years, and we thank each of you for making Top Flight such a great and fun place to be," the announcement says. Officials at the sports center initiated the investigation in June with the state Department of Public Health, which licenses child-care facilities. The state Department of Children and Families was notified, and the New Milford Police Department became involved. Top Flight voluntarily relinquished its child-care license June 29 and shut down the child-care part of the business, as well as its summer camp operation. In giving up the license, David Amory, listed in official documents as the legal representative for Top Flight Gymnastics Center Inc. and the holder of the child-care license, signed the following statement:

"I understand and agree that I, David Amory, legal representative for the operator, shall remain out of the facility, off the premises, and off the property at 17 Pickett District Road, New Milford, Conn., until after the close of the center on June 29." Phone messages left for Mr. Amory were not immediately returned Monday, nor were calls to other staff members. Police confirmed detectives are continuing to investigate allegations of abuse, but no arrests have been made. In the formal announcement on the Top Flight website, the center's management wrote that financial constraints caused by the closing of the child-care center and summer camp "have made it impossible for the remaining programs to continue." The announcement made no mention of the ongoing state and local investigations.

On Facebook, several parents lamented the loss of the facility, which also provided gymnastics and martial arts classes, swimming lessons and a recreational space called Planet Play, featuring inflatables and obstacle-type equipment.

72.     On 8/1/2012, more than a month after other allegations against Amory had become public and Top Flight had shut down, the New Milford police received a call from S.B.'s parents. They stated that S.B. (then age 8) had attended Top Flight between 2007 and December 2011, as well as one week in June 2012. At around the time Top Flight shut down, they had asked their children – S.B. and her older brother A.B. who had also attended Top Flight – if there was anything unusual about Top Flight that mad them uncomfortable. They stated that everything was "OK." Several weeks later, S.B.'s mother asked her about Amory again. This time S.B. claimed that on several occasions when Amory read books to S.B. and other children, he would put his arm around her and put his hand down the front of her pants, touching skin to skin. She stated that he never touched her private area. She said that he would also put his hand down the back of her pants touching skin to skin, but that he never went below the "crack of her butt." In a subsequent CAIT interview, S.B. stated that Amory had touched her like this more than five times, that there were no adults around when it happened, that he had touched the top of her "private," and that "maybe" he had touched "between the parts of her butt."

73.     S.B. denied any touching repeatedly for three weeks before she made her disclosure. S.B. told the forensic interviewer that her mother, Susan, kept talking about it and asking her about it. The mother was upset and concerned for her daughter. The mother would not accept "no" when S.B. kept telling her that nothing happened. S.B. knew that her mother was very relieved once S.B. told her that something had happened. S.B. also did not have to answer any more of her mother's questions about it. S.B.'s mother never had any indication that her child, S.B>, did not like going to Top Flight or that anything inappropriate was going on. The mother never saw any indication that S.B. was uncomfortable or being in appropriately touched at Top Flight or else the mother would have pulled her out right away.

74.     After the forensic interview, S.B. was taken by her mother to Quassy amusement park.

75.     S.B.'s mother had consulted with a lawyer about bringing a civil suit against Amory and Top Flight.

76.     On 8/1/2012, S.B.'s parents contact NMPD

77.     **Missing Exculpatory Evidence re S.B.**

July-August 2012 – Interviews by NMPD – James Mullin
- Barbara Matson – Jessica's mother
- Susan B. - mother
- Christian B. - father
- A.B. – brother, attended with S.B.
- Top Flight Staff
- Notes from original conversation with S.B.

78.     On 8/3/2012, DCF substantiation re M.M. as to emotional neglect, sexual abuse & physical neglect. Recommendation to be placed on Central Registry. Signed by Michael Damici. DCF Investigator. Damici did little to investigation at all.

79.     On 8/15/2012, CAIT Interview of S.B. by Diane Edell. Observers: Detective Mullin, NMPD. RATAC forensic interview protocol focuses on the presence of bias or neutrality in questioning. A widely accepted and highly recommended safeguard against interviewer bias is the exploration of alternative hypothesis. In a forensic interview, alternative hypothesis questions are asked to explore alternate explanations for a child's reported experience. Ms. Edell did not follow proper protocol for the forensic interview in numerous way, as described in detail by Dr. Bruck at the Amory criminal trial. Yet DCF routinely retains forensic interviewers whose sole purpose is to come up with usable evidence for DCF against the "perpetrator." Guilt is assumed and the search thus is for "evidence" – not for the truth of whether the accusation is false.

80.     The forensic interviews were held on 6/29/2012 and 8/15/2012. Interviews are ordinarily part of the Multidisciplinary Team (MDT) investigation. The Multidisciplinary Team is part of the Governor's Task Force on Justice for Abused Children. DCF funds the teams through its state budget. A contractor hires and supervises the forensic interviewers.

81.     The Task Force has established Best Practices for Interviews in Connecticut. Among those Best Practices are the following:
The Interview –

        8.   Interviews should be conducted in a neutral, fact-finding manner.
        9.   MDTs should agree upon nationally accepted interviewing models to be used by all forensic interviewers for that MDT. All team members should be knowledgeable about the chosen model and should be capable of explaining and defending the model in court.

        11.  Anatomically detailed interview aides such as dolls and drawings should be used with caution according to recent research and practice. Anatomically detailed dolls should not be used unless the interviewer has received training in the use of such tools.

82.     Upon information and belief, neither DeLouis, Mullin nor Damici were trained in the MDT protocols regarding interviews.

83.     Upon information and belief, the Children's Advocacy Center (CAC) was acting at the behest of DCF/Damici, DeLouis and Mullin in setting up and arranging for the interview.

84.     It is the policy and practice of CAIT to allow DCF and police officers to suggest questions for the interviewer to ask the child, including recessing the interview to accommodate such requests.

85.     At the trial of State v. Amory, Detective Mullin testified that he had not been trained in the RATAC protocol for forensic interviewers. Mullin also admitted that he had fed questions to the interviewer.

86.     Dr. Maggie Bruck testified at the State v. Amory trial that it is improper for observers to interrupt the forensic interviewer and there are certain steps the interviewer is to go through during the questioning process.

87.     Maggie Bruck, Ph.D. is a professor at Johns Hopkins University, in the Department of Psychiatry and Behavioral Science, and Acting Director, Division of Child and Adolescent Psychiatry. Dr. Bruck, along with co-author Professor Stephen J. Ceci, wrote the highly acclaimed book, Jeopardy in the Courtroom, A Scientific Analysis of Children's Testimony. Among numerous research papers and books, she has also written: Children's Reports of Touches, Risks and Benefits of using Body Diagrams and also the Handbook of Child Psychology.

88.     Dr. Bruck testified on 5/28/2015 in the State v. Amory trial about techniques used by forensic interviewers in Connecticut when investigation allegation of child sexual abuse. Those interviews were done in conjunction with DCF in 2011 and 2012. In particular, Dr. Bruck testified about forensic interview techniques used by Diane Edell when interviewing S.B. Dr. Bruck's opinion is essentially as follows:

89.     The forensic interviewers in Connecticut used many improper techniques, including the use of repeated questions, Biased interviewers use highly suggestive interviewing techniques which lead to many false reports/ false positives; repeated interviews until the child says what the interviewer wants; stereotyped induction with vilification of the suspect; improper use of anatomical drawings; improper use of anatomical dolls; and, failure to explore alternative.

90.     Dr. Bruck testified that the RATAC protocol had been the most popular interviewing technique in the United States, but that research has shown that using the RATAC protocol caused more false reports than when children just gave a verbal account. Bruck explained that the RATAC protocol has undergone a huge redevelopment and the protocol has changed because of the research. The emphasis now is on open-ended questions, and non-use of props. The new protocol does not use dolls or body diagrams. It avoids the use of specific direct questions. So the interviewer only asks facts already mentioned. RATAC is now called Child First.

91.     A child subject to RATAC questioning techniques is likely to make a false report. It is easier to point than to talk so the pointing promotes false memories. Use of RATAC increases the risk of false disclosures and then the false disclosures are used as evidence.  Using props in interviews with children is not a good because they play with them and they are distracting.

92.     The focus of Dr. Bruck's entire testimony was on reliability – that the disclosures were inherently unreliable based on all the factors Dr. Bruck testified to, as set forth above.

93.     **S.B. – Interview Observations**

Date of Interview:  8/15/2012
Date of Alleged Incident:   S.B. not sure
Interviewer: Diane Edell.     Present: James Mullin

A.     S.B. had clearly been coached on many of her responses.

B.     There are key events that happened prior to this interview:

- 6/27/2012. Top Flight announced the closing of its summer camp and childcare programs
- 6/30/2012. The Connecticut DPH posted on their website the allegations of abuse along with a statement Amory was coerced into signing.
- 7/3/2012. Numerous stories begin appearing in the media (TV & Newspaper) detailing the allegations.
- 716/2012. Top Flight announced it will be closing August 4.
- 8/4/2012. Top Flight closes its doors.

C.      There is no doubt that by August 2012 almost EVERY parent in New Milford was questioning their child about Amory and Top Flight. It is surprising there were not more of these false allegations given the firestorm of misinformation that was being fueled by the media and DPH.

D.      S.B.'s bus was the last to arrive for the after school program. There were always 40 - 50 children, 4-5 staff and parents present when S.B. arrived from school.

E.      Reading took place in the "Preschool Room", a glass walled room in direct line of sight of the front desk. All four bathrooms were located in this room along with cubbies and hooks with children's belongings. Needless to say there was a constant stream of children, staff and parents in and out of the "Preschool Room" at all times.

F.      Amory could not have been holding a book in one hand, turning pages with another and reading aloud in the presence of other children, staff and parents while Amory allegedly put his hand down the front of S.B.'s pants as she describes.

- Interviewer asks leading questions
- S.B. fidgets quite a bit during interview
- Preschool room is described very poorly - need to show video and pictures
- Other kids in Planet Play - kids would have to enter room to use restroom
- Statements - Just like my aunt and mom would do on my back
- Since Top Flight closed down my mom and dad were asking me if anything happened
- S.B. says she is going to Quassy Amusement Park after interview

94.   **Forensic Interview Notes**

A.      Pre-Interview Meeting Information: Detective Mullin states other complaints, similar to S.B.'s, have been made. Were the B.'s aware of these complaints? Was S.B. aware of these complaints? If so this could have seriously contaminated any interview S.B. gave.

B.      Disclosure/Abuse Scenario: States S.B. indicated on drawing where Amory's hand allegedly was. What is not explained is that interviewer Diane Edell draws a circle around the shoulder blades and a circle around the buttocks of an anatomical drawing. S.B. has to choose between the 2 areas, there is no option to choose the lower part of her back. This is very obvious in video tape.

C.      Details Provided: Contextual Details Provided: S.B. states there were no other adults present. This could easily have been verified from Top Flight staff records or interviews with staff. Why not?

D.      Summary: States S.B. provided a clear and consistent report. The report was NOT consistent with what parents reported in call on 8/1/12.

E.      Footer note: states that video was recorded and was NOT reviewed in the preparation of report. Why not? This is a very serious allegation. Everything hinged on this interview. There were no other witnesses or physical evidence to rely on.

F.      Interviewer Diane Edell deviates from RATAC protocol by taking question from Detective Mullin and going back to review section already discussed.

95.     **July/August 2012**

Neither DCF nor NMPD sought to interview Amory's ex-wife, Jennifer Rose, or his children, Elizabeth and Luke, all of whom testified at the State v. Amory trial. Perverts do no come out of nowhere – they have a history. It would be incongruous for a middle-aged male to suddenly start molesting kids at a child care when he never abused his own children. It would have been a logical step to interview Amory's ex-wife and children.

96.     On 8/28/2012 –Arrest Warrant for M.M.'s report sworn by Detective Peter DeLouis. Arrest Warrant for S.B.'s report sworn by Detective Peter DeLouis.

97.     In neither arrest warrant does Detective DeLouis state any experience in investigating child sexual abuse, any training in RATAC protocol, any training in how to evaluate false reports of child sexual abuse, any training in how to evaluate false positives given by an apparent "disclosure" by a child, no training in peer contamination and tainted interviews.

98.     **Arrest Warrant – (M.M. – complaining witness)**

A.      M.M. was straddling Amory's right leg, NOT sitting on his lap. Surveillance video shows this.
B.      Did M.M. tell Brandi or Jessica first? Brandi said M.M. was laughing when she told her.
C.      If M.M. felt uncomfortable why didn't she move? Video shows her moving to sit with other kids then coming back to Amory. She obviously was free to move about.
D.      Circumstances surrounding surrender of license.
E.      There were 13 other children in the room with M.M., some sitting next to her and directly behind her. Some of their names are mentioned in Staff reports. None of them were interviewed.
F.      Again report states M.M. was sitting on Amory's lap. Video shows her straddling his right leg. Brandi confirms this.
G.      M.M. states she was on Amory's lap until the movie was over. Video clearly shows him getting up and leaving before end of movie.
H.      Why did M.M. wait until 4:30, just before her stepfather arrived? Why not wait until she got home to tell mom in private? Why did she not want Jen Benedict to know?

I.      M.M. had been seeing a therapist prior to and while attending Top Flight. She met with her therapist between the time of the allegation and the CAIT interview 8 days later.

J.      Why did mom want M.M. to talk to her therapist first?

K.      Jen Benedict was shown the Licensing Corrective Action Plan on January 13th, she and Amory together agreed to modify staff schedule. Jen was shown LCAP again on March 9th in Attorney Klein's office.

L       Jen Benedict states she has known M.M. since September. In fact M.M. had only been attending Top Flight since April 30. She had only been attending for 7 weeks prior to allegation. A simple review of Top Flight records would have confirmed this.

M.      Brandi Piskura in her original statement says she asked the other kids if they had seen anything unusual, none said they had. This does not make it into her final statement –Why not?

## 99.    **Arrest Warrant (S.B.) - Report Notes**

A.      The type of training Detective Peter DeLouis had is not listed. DeLouis does not list ANY training on RATAC protocol or the proper way to observe and evaluate a forensic interview regarding child abuse. No mention of training regarding investigation of alleged child sexual abuse.

B.      S.B.'s brother A.D. attended every day at Top Flight, but he was not interviewed.

C.      The parents were never interviewed or asked to give statements.

D.      The report indicates that Top flight had shut down, but this was not expanded upon. There were news stories on CT Channel 4 Fox News and articles in the Danbury News Times WEEKS BEFORE the B's contacted the police. This was a major event.

E.      The mother was not asked to make notes of the original conversation with S.B.. This is supposed to be most important for a disclosure of abuse. At the trial it was clear the mother was not truthful about the number of times she had asked S.B..

F.      The report states "Dave from Top flight would read stories to her and other kids in the preschool room". Who the other kids were was not list, nor were they interviewed.

G.      In the CAIT interview S.B. said her friend Jesse was also there. Defense Attorney John Swomley spoke with J.M.'s mother Barbara, who said she gave a statement to police. This statement was never disclosed by the NMPD.

H.      Detective DeLouis did not visit the Top Flight preschool room. If he had, he would have seen it was one of the most heavily used rooms in the building where all of the childcare bathrooms and child cubbies are located. The room is also clearly visible from the front desk area.

I.      From 2007-2012 S.B. and her brother would have come in contact with more than 30 different Top Flight staff and over 100 different children and parents. None of these people interviewed.

100.    On 9/27/2012, DCF Notification of substantiation from Damici as to S.B. Damici had done very little investigation and had not even attended the forensic interview of S.B.

101.    On 10/2/2012, both Arrest Warrant (M.M. and S.B.) signed by Judge Gill.

102.     On 10/4/2012, Notification of Internal Review results upholding substantiation of M.M.. Letter signed by Erika Mongrain, Program Manager. Notification does not indicate anything other than a rubberstamp of the decision, with any actual "review."

103.     On 10/9/2012, arrest of David Amory (victim M.M.) on charges of Sexual Assault in the 4th Degree, in violation of C.G.S. 53a-73a and Risk of Injury to a Minor, C.G.S. 53-21(A)(2). Amory was held on $20,000 bond. Arrest of David Amory (victim S.B.) on charges of Sexual Assault in the 4th Degree, in violation of C.G.S. 53a-73a and Risk of Injury to a Minor, C.G.S. 53-21(A)(2). Amory was held on $20,000 bond. Total bond was $40,000. Bond was reduced to $30,000.

104.     On 10/10/2012, Amory requested an administrative hearing – deferred, as to S.B.. On 10/12/2012, Amory requested an administrative hearing – deferred, as to M.M.

105.     On 3/18/2013, Amory's attorney, David Moraghan is notified of legal representation by Danbury law firm. Attorney Steven Smart sent letter to Attorney Moraghan that he was representing S.B.

106.     **Bankruptcy**

Amory filed for bankruptcy on 2/19/2014
Debts: $576,176.70
Assets: $26,761.01
Discharge of debt on 6/6/2014

All debts were business related. Amory had $0 personal debt at time of bankruptcy filing. Amory had personally guaranteed two SBA loans, which is why he had to file chapter 7 personal bankruptcy.
Discharge of bankruptcy debt on 6/6/2014.

107.     During the criminal case proceeding, the defense filed a motion for discovery of M.M.'s therapy records, but the court denied those motions.

108.     The TF blue room video shows that M.M. was thoroughly happy in the blue room. Something is very odd about her "disclosure" when step dad show up.
The pieces do not fit – M.M. was already in therapy for something. Something prompted this – sounds like there was on ongoing problem. Why was she in therapy?

109.     On 5/19-29/2015 the <u>State v. Amory</u> (S.B. – complainant) trial in Litchfield Superior Court.

110.     On 5/22/2012 defense witnesses testified:

**Defense witnesses**
Christian B. – father
Peter DeLouis – NMPD detective

John Pudlinski – Litchfield Hills Investigative Services
Diane Edell – CAIT Interviewer
Jim Mullin – NMPD detective

111.    On 5/27/2012, more defense witnesses testified:

Kelly Hall – Top Flight summer camp director
Stephanie Thibodeau – Top Flight senior staff member
Jennifer Rose – former spouse
Luke Amory – son
Elizabeth Amory – daughter
David Amory – defendant

112.    On 5/28/2015 a key defense witness, Dr. Maggie Bruck, testified. Dr. Bruck, who is department chairwoman at John Hopkins Medical School in Baltimore, testified that young children are highly suggestible and answer interviewer's questions in the way they perceive the interviewer would want them to respond. Bruck told the court the testimony from the victims, who are now 11, could not be relied upon. The interview techniques that were used are no longer used even by the state because it was found that those techniques led to a large number of false positive claims.

113.    On 5/29/2015, there was a Jury Verdict Not Guilty. The Jury returned a verdict after about 3 hours of deliberations to end the two-week trial in state Superior Court in Litchfield. Jurors took less than three hours to find Amory not guilty of sexually assaulting two young girls at his gymnastics center in New Milford three years ago. Six jurors – five women and one man – vindicated Amory, who simply touched his young charges in a fatherly manner, and not for sexual gratification as the state alleged in two counts of fourth-degree sexual assault.

114.    Plaintiff's hands-on manner of caring for children at his gymnastics and day care center in New Milford was twisted into a story of criminal assault by the adults who elicited information from two 8-year-olds.  Videotaped interviews of the girls by forensic investigators were played for the jury.

115.    Plaintiff was a family man, attracted to adult females who raised two children after his wife divorced him. There was no evidence that either of his two children or their friends were sexually abused. Plaintiff was devoted to kids whose parents worked during the day by caring for them at the Top Flight Gymnastics Center he launched with his wife. The center closed in 2012.

116.    Plaintiff was a gym coach, opened a gym academy, and grew it to include child care, a pool and summer camp. He did many jobs, many of which didn't directly involve child care. He touched lots of children and has had an enormously positive influence on them. There were kids who spent more time with counselors and Mr. Dave than their own parents. There is nothing wrong with nurturing. There was no sexual interest. A pedophile would have been going for the gold, instead of directing contact, as one of the girls said, just a teeny bit below the belly button.

117.    S.B. was not in pain, withdrawn, traumatized, depressed. She described Amory's touch as like a back rub.

118.    The primary focus of Dr. Bruck's entire testimony was on reliability – that the alleged "disclosures" were patently unreliable and the many reasons for unreliability.

119.    DCF has no training whatsoever on "TAINT" – the reliability of alleged disclosures.

120.    The New Milford Police has no training on TAINT – the reliability of alleged disclosures.

121.    On 11/30/2015, Deputy Chief of Police Mark A. Buckley wrote to plaintiff's counsel in response to a FOIA request, stating: "There was nothing specific to any information regarding 'training manuals, policies and procedures, handouts, seminars, or any other type of training in regard to sexual abuse investigations, including how to work with and observe a forensic interview, and RATAC protocols in effect on 1/1/2012' other than what was produced under (2) and (3) below."

122.    The training records for Detective DeLouis and Mullin regarding sexual abuse investigations do not have anything specific to what would assist in performing an investigation when forensic interviews are involved, and there is nothing about how to work with a multidisciplinary team, how to evaluate reliability – the TAINT factors inherent in child sexual abuse investigation, especially of the Amory investigation, which had been widely covered in the news BEFORE the forensic interviews.

123.    In neither arrest warrant does Detective DeLouis state any experience in investigating child sexual abuse, any training in RATAC protocol, any training in how to evaluate false reports of child sexual abuse, any training in how to evaluate false positives given by an apparent "disclosure" by a child, no training in peer contamination and tainted interviews – essentially how to evaluate reliability.

124.    On 5/22/2015 Detective Mullin testified that he had never been trained in RATAC protocol.
He also testified that he routinely provided questions to the forensic interviewer through the earpiece. Dr. Bruck has stated that this is improper because it deviates from the RATAC protocol.

125.    Conn. Gen. Stat. § 17a-105a provides:
    **Sec. 17a-105a. Child abuse and neglect unit within Division of State Police to assist investigation of child abuse and neglect.** There shall be within the Division of State Police within
    the Department of Emergency Services and Public Protection a child abuse and neglect unit which, within available resources, shall (1) at the request of the Commissioner of Children and Families or the head of the local law enforcement agency, or such person's designee, assist a multidisciplinary team established pursuant to section 17a-106a in the investigation of a report of child abuse or neglect, (2) investigate reports of crime involving

child abuse or neglect in municipalities in which there is no organized police force, and (3) participate in a mutual support network that shares information and collaborates with local law enforcement agencies.

126.    Conn. Gen. Stat. § 17a-105a is a clear indication that the investigation of child abuse and neglect requires specialized training. Yet DCF social worker Damici did not request a specially trained state police trooper, nor – upon information and belief, did Damici request that a multidisciplinary team investigate the allegations.

127.    In Damici's investigation as to M.M. he indicates "none" as to the safety questions of
a) concerns of substance abuse/DEC;
b) concerns of domestic violence; and
c) concerns of mental health issues.

128.    The "M" family did in fact have a history of substance abuse, domestic violence and mental health issues. This information is also left out of the Forensic Report and the Arrest Warrant. This is important because the background family information lead to the theory that M.M. was "acting out" pre-existing family issues on Amory.

129.    Damici's investigation was clearly inappropriate and used inadequate investigative technique. There is no mention of the extraordinary publicity surrounding Top Flight, the obvious implication of taint – the relentless questioning by parents, the taint of peer contamination, and the suggestibility of the witnesses.

130.    Damici did not explore evidence that either M.M. or S.B. may have been influenced to testify in a particular manner – such evidence was relevant, admissible, and exculpatory.

"In light of the well-established reality of children's susceptibility to suggestive interview practices and [the Appeals Court's] explicit acknowledgment that leading or coercive [or suggestive] questioning [and interview techniques] can distort a child's memory, the factual background suggestive of false, inaccurate, or subtly induced allegations by [the victim] made the specifically identified … records [regarding the interviews] *prima facie* relevant.  Who was present, how questions were posed, what responses were given and how they comported with later allegations were all matters that defense counsel should have been given the opportunity to ascertain …." Commonwealth v. Pare, 686 N.E. 2d 1025, 1033 (Mass. App. Ct. 1997), *aff'd*, 693 N.E.2d 1002 (Mass. 1998) (internal citations and quotations omitted); *see also* State v. Aponte, 249 Conn. 735, 751-52 (1999) (noting that interview techniques play important role in suggestibility of child witnesses); State v. Michaels, 642 A. 2d 1372 (N.J. 1994). The susceptibility of a child victim to be influenced by the interview techniques used is in fact an extensively well-researched topic.  In light of this possible influence, courts across the nation are taking concerted action to ascertain children's testimony at pretrial hearings regarding taint. *See* Mason v. Braithwaite, 432 U.S. 98 (1977), Stovall v. Denno, 388 U.S. 293 (1967), *U.S. v. Wade*, 388 US 218 (1967) and Gilbert v. California, 388 U.S. 263 (1967).

Connecticut supports the protocol of its sister states in adopting pretrial measures.  In State v. Aponte, 249 Conn. 735, 738 A. 2d 117 (1999), the court acknowledged the inherent suggestibility of children and found that this susceptibility, coupled with the prejudicial misconduct of the prosecution, jeopardized the defendant's right to a fair trial.  In laying the foundation for future taint hearings, the court found that:

> [b]ecause young children are sensitive to the status and power of their
> interviewers and as a result are especially likely to comply with the implicit and
> explicit agenda of such interviewers…children…are more willing to go along
> with the wishes of adults and to incorporate adults beliefs into their reports.

*Id*. at 751 (internal quotes and citation omitted)

131.    The credibility of the complainant was the key issue in the investigation. Yet Damici simply went through the motions, making no attempt whatsoever to explore the issues of taint, in a clearly inadequate investigation using improper techniques.

132.    Moreover, DCF does not train its social worker and investigators in the proper techniques in determining reliability. Upon information and belief, there is no training whatsoever by DCF as to issues of taint – peer contamination, interviewer, the effect of relentless questioning by parents and the suggestibility of witnesses, all leading to unreliable disclosures.

133.    Damici received a fax from Jen Benedit on 6/29/2012 with the names and contact information of all the kids present in the blue room. Damici does not begin to contact parents until 7/16/2012, seventeen days later. Phone calls with parents beginning on 7/16/2012 repeatedly refer to the media coverage surrounding this case. None of the 13 parents report anything that confirms M.M.'s allegation. There is never any attempt to interview the kids themselves.

134.    Upon information and belief, DCF did not train in nor did Damici receive adequate training in:

a)      interviewer bias and how it taints an interview;
b)      the factors that lead to false reports of sexual abuse;
c)      how to discern false positives in regard to disclosures of child sexual abuse;
d)      improper use of anatomical drawings;
e)      improper use of anatomical dolls;
f)      the proper way to observe a forensic interview;
g)      proper forensic interviewing techniques;
h)      use blatantly improper leading question during interviews;
i)      the RATAC or Child First protocol;
j)      not interrupting a forensic interview;
k)      fabrication of evidence by social workers determined to win a case;
m)      putting more emphasis on winning than for searching for the truth;
n)      focusing on the best interests of DCF rather than the best interest of the child;

135.    On 7/21/2015, charges against Amory in State v Amory (M.M. – complaining witness) dismissed.

136.    At no time did plaintiff commit any offenses in violation of the laws of the State of Connecticut or the United States.

137.    There was no legal cause to justify the arrest of plaintiff or the institution of charges against plaintiff.

138.    At all times relevant to this Complaint, the conduct of defendants Katz, Damici, DeLouis and Mullin was in willful, reckless and callous disregard of plaintiff's rights under federal and state law. All of the defendants had a duty to act with reasonable care toward plaintiff.

139.    As a direct and proximate result of the conduct of defendants, plaintiff suffered and continues to suffer physical and psychological harm, extreme humiliation, pain and suffering, terror, mental anguish and depression, and lost wages.

## IV.    CAUSES OF ACTIONS

**FEDERAL CLAIMS – Violation of Civil Rights, 42 U.S.C. § 1983**

**Count One: Failure to Train/ Failure to Supervise, including failure to train in conducting investigations of child sexual abuse, which includes retaining forensic interviewers who use improper and leading interview techniques- 4th & 14th Amendments**
(against Commissioner Katz)

140.    Paragraphs 1 – 139 are incorporated by reference.

141.    Defendant Katz had supervisory and/or policy making authority, had a duty to plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter "policy" or "policies") which confirm and provide the protections guaranteed plaintiffs under the United States Constitution, including those under the Fourth, and Fourteenth Amendments. Katz had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all her agents, officers and employees, and those acting under them within DCF, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of plaintiffs in order to avoid causing the injuries and damages alleged herein.

142.    Based on the duties charged to Katz, including the nature of DCFs' work relating to investigations of allegations of child sexual abuse, Katz knew or should have known of the obvious need to establish customs, policies, and practices required to protect the aforementioned civil rights of plaintiffs.

143.    Katz, through DCF, established and/or followed policies, procedures, customs, and/or practices which polices were the moving force behind the violations of plaintiff's constitutional rights, including those under the Fourth and Fourteenth Amendments, by, but not limited to:

a)    Failure to train about interviewer bias and how it taints an interview;
b)    Failure to train about the factors that lead to false reports of sexual abuse;
c)    Failure to train in how to discern false positives in regard to disclosures of child sexual abuse;
d)    Failure to train on improper use of anatomical drawings;
e)    Failure to train on improper use of anatomical dolls;
f)    Failure to train on the proper way to observe a forensic interview;

g)      Failure to train on proper forensic interviewing techniques;

h)      Policies of retaining forensic interviews who use blatantly improper leading question during interviews;

i)      Failure to train in the RATAC or Child First protocol;

j)      Failure to train in not interrupting a forensic interview;

k)      Fabrication of evidence by social workers determined to win a case;

m)      Putting more emphasis on winning than for searching for the truth;

n)      Focusing on the best interests of DCF rather than the best interest of the child;

o)      Policies of a witch hunt mentality assuming the guilt of the "perpetrator" (cf the McMartin case in the 1980s);

p)      Failure to train about peer contamination regarding forensic interviews;

q)      Policy of DCF's conflict of interest regarding federal funding, with goal of maximizing federal funding at the expense of the best interest of child or truth and justice;

r)      Policy of using biased forensic interviewers through the CAIT, which is not an independent organization but funded through DCF and thus the interview is not objective;

s)      failure to train in when/how to initiate a multidisciplinary investigation;

t)      by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those enumerated above.

(This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff may seek leave to amend this pleading as more information becomes available.)

144.    Commissioner Katz provided grossly inadequate and unprofessional training and supervision to DCFs agents and employees regarding investigating child sexual abuse disclosures, and a-t above.

145.    Commissioner Katz knew or should have known that DCFs employees were improperly trained and supervised in said issues.

146.    Katz knew or should have known that DCFs employees would confront said issues in their work and that, without training, would make the wrong decisions on said issues.

147.    As a result of Katz's actions, plaintiff suffered the loss of his business, had to file for bankruptcy, lost wages, incurred medical, legal, counseling and other expenses, and plaintiffs suffered extreme humiliation, pain and suffering, terror, mental anguish and depression.

**Count Two:   Monell /failure to train – New Milford**
(against Town of New Milford and New Milford Police Chief)

148.    Paragraphs 1 – 139 are incorporated by reference.

149.    The violations of plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, plaintiff's damages and the conduct of the

individual defendants were directly and proximately caused by the actions and/or inactions of defendant Town of New Milford, which has encouraged, tolerated, ratified, and has been deliberately indifferent to the following policies, patterns, practices and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of:

a)      Failure to train about interviewer bias and how it taints an interview;
b)      Failure to train about the factors that lead to false reports of sexual abuse;
c)      Failure to train in how to discern false positives in regard to disclosures of child sexual abuse;
d)      Failure to train on improper use of anatomical drawings;
e)      Failure to train on improper use of anatomical dolls;
f)      Failure to train on the proper way to observe a forensic interview;
g)      Failure to train on proper forensic interviewing techniques;
h)      Policies of retaining forensic interviews who use blatantly improper leading question during interviews;
i)      Failure to train in the RATAC or Child First protocol;
j)      Failure to train in not interrupting a forensic interview;
k)      Putting more emphasis on winning than for searching for the truth;
m)      Policies of a witch hunt mentality assuming the guilt of the "perpetrator" (cf the McMartin case in the 1980s);
n)      Failure to train about peer contamination regarding forensic interviews;
o)      by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those enumerated above.
p)      The practice among New Milford police officers of instituting false charges against individuals who have been falsely accused of sexual abuse by children.

**Count Three:**          **False arrest – 4th & 14th Amendments**
(against New Milford Police Officers DeLouis and Mullin)

150.    Paragraphs 1 – 139 are incorporated by reference.

151.    Plaintiff had a clearly established Constitutional right to be free from false arrest. As a direct result of defendants' conduct, plaintiff was falsely arrested despite the absence of probable cause to establish that he had committed any crimes. Defendants' conduct, as described above, deprived plaintiff of his right to be secure in his person against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

152.    At the time defendants applied for the arrest warrants they knowingly and intentionally, or with reckless disregard for the truth, misrepresented the facts (as described above) in an effort to cause the Magistrate Judge to sign the arrest warrants for plaintiff, even though probable cause did not otherwise exist.

153.     Additionally, defendants knowingly and intentionally, or with reckless disregard for the truth, omitted from their affidavits material facts within their knowledge which would have negated probable cause.

154.     Defendants actions that caused plaintiff to be arrested, as described in this Amended Complaint, were done knowingly and intentionally, or with reckless disregard for the truth.

155.     In Paragraphs 1 - 139 above, plaintiff pleads civil liability against defendants based on a "Franks" violation by defendants. *See* <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). *See also*, <u>McColley v. County of Rensselaer</u>, 740 F.3d 817 (2d Cir. 2014).

156.     In the alternative, and incorporating paragraphs 1 – xx by reference, plaintiff pleads that defendants are liable to plaintiff in that they knowingly and intentionally, or with reckless disregard for the truth, presented facially deficient warrant affidavits to the Magistrate Judge. As a direct result of defendants' conduct and actions, plaintiff was wrongfully arrested and maliciously prosecuted even though probable cause did not exist.

157.     For all the reasons set forth above, these arrests and malicious prosecutions were a violation of plaintiff's Fourth Amendment right to be free from an unreasonable and illegal seizure of his person. By this pleading, which is made in the alternative to the above-described <u>Franks</u> violation, the plaintiff is invoking the doctrine as set forth in <u>Malley v. Briggs,</u> 475 U.S. 335, 344-45 (1986), and its progeny.

158.     As set forth above, a criminal prosecution was commenced against plaintiff, and the defendants initiated or procured the prosecution. The prosecution was terminated in plaintiff favor on 5/29/2015, when a jury found plaintiff not guilty of all charges in State v. Amory (S.B. – complaining witness). On 7/21/2015, charges against Amory in State v. Amory (M.M. – complaining witness) dismissed. Plaintiff was innocent of the charges.

159.     Defendants did not have probable cause to initiate or procure the prosecution of plaintiff, and they acted with malice. Plaintiff suffered damages as a result of this malicious prosecution, including harm to their reputation, emotional distress, the cost of defense, and other damages. Plaintiff's injuries resulted from defendants' malice, which entitles plaintiff to exemplary damages.

160.     The actions of DeLouis and Mullin violated plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from false arrest.

**Count Four:          Malicious Prosecution – 4th & 14th Amendments**
(against New Milford Police Officers DeLouis and Mullin)

161.     Paragraphs 1 – 139, 150-160 are incorporated by reference.

162.     The actions of DeLouis and Mullin violated plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from malicious prosecution.

**Count Five:          Fabrication of Evidence – Due Process**
(against New Milford Police Officers DeLouis and Mullin))

163.     Paragraphs 1 – 139 are incorporated by reference.

164.     The defendants knowingly created false and misleading evidence, twisted and blatantly misrepresented the 6/21/2012 Top Flight blue room video, and omitted material information from the arrest warrants. Had the Magistrate/Judge had the exculpatory information omitted from the arrest warrants, under the corrected affidavit doctrine the warrants would not have been signed as there would have been no probable cause.

165.     On June 25, 2012, Top Flight's 3 week video surveillance tape was given to New Milford Officer Mullin by Jen Benedict. This tape would have shown various other angles of the scene, thus showing that the defendant officers' description of the 6/21/2012 incident was false.

166.     Such activity qualifies as an unconstitutional deprivation of the plaintiffs' rights. Moreover, this right was clearly established at the time of the defendants' conduct. *See* Morse v. Fusto, 804 F.3d 538 (2d Cir. 2015).

167.     Fabrication of evidence is an actionable due process clause violation. Brown v. Miller, 519 F.3d 231 (5th Cir. 2008) ("We therefore hold that the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights."); Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004)(describing the fundamental concept "that those charged with upholding the law are prohibited from deliberately fabricating evidence"). "The fabrication of evidence by a police officer displays not just a callous indifference to the rights of the arrestee, but also constitutes an egregious abuse of authority. It betrays the trust that society has placed in its law enforcement personnel, and distorts our system of justice." Garnett v. Undercover Officer C0039, 2015 U.S. Dist. LEXIS 45232. Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir.2007) ("[T]he chain of causation need not be considered broken if [a defendant government agent] deceived the subsequent decision maker or could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty." (alteration in original) (citation and internal quotation marks omitted)); Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir.2000) ("Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty").

 Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial . . . ."; *see also* Jocks v. Tavernier, 316 F.3d 128, 138 (2d Cir. 2003) (citing Ricciuti for the same proposition). In Ricciuti, the court did not require that the false information submitted to the prosecutor be used at trial, or even that a trial ever take place—the claim accrues when the officer forwards the false information to the prosecutors.

**STATE CLAIMS - Violation of State Law & Constitution**

**Count Six:          False Arrest at common law**
(against New Milford Police Officers DeLouis and Mullin)

168.    Paragraphs 1 – 139, 150-160 are incorporated by reference.

169.    The actions of detectives DeLouis and Mullin constitute the tort of false arrest under the laws of the State of Connecticut.

**Count Seven:          Malicious Prosecution at common law**
(against New Milford Police Officers DeLouis and Mullin)

170.    Paragraphs 1 – 139, 150-160 are incorporated by reference.

171.    The actions of detectives DeLouis and Mullin constitute the tort of malicious prosecution under the laws of the State of Connecticut.

**Count Eight:          Fabrication of Evidence – Due Process**
(against New Milford Police Officers DeLouis and Mullin)

172.    Paragraphs 1 – 139 are incorporated by reference.

173.    The defendants knowingly created false and misleading evidence, twisted and blatantly misrepresented the 6/21/2012 Top Flight blue room video, and omitted material information from the arrest warrants. Had the Magistrate/Judge had the exculpatory information omitted from the arrest warrants, under the corrected affidavit doctrine the warrants would not have been signed as there would have been no probable cause.

174.    On June 25, 2012, Top Flight's 3 week video surveillance tape was given to New Milford Officer Mullin by Jen Benedict. This tape would have shown various other angles of the scene, thus showing that the defendant officers' description of the 6/21/2012 incident was false.

175.    Such activity qualifies as an unconstitutional deprivation of the plaintiffs' rights. Moreover, this right was clearly established at the time of the defendants' conduct. *See* Morse v. Fusto, 804 F.3d 538 (2d Cir. 2015).

**Count Nine:          Intentional Infliction of Emotional Distress**
(against New Milford Police Officers DeLouis and Mullin)

176.    Paragraphs 1 through 139 are incorporated by reference.

177.    The aforementioned actions by defendants DeLouis and Mullin were intentional, willful and deliberate and caused plaintiff to suffer from severe emotional distress, which the defendant officers knew or should have known would have resulted from their actions.

178.    Said conduct was extreme and outrageous; said conduct was the cause of plaintiff's distress; the emotional distress sustained by plaintiff was severe. As a result of defendants DeLouis' and Mullin's actions, plaintiff suffered damages as set forth above.

**Count Ten:    Intentional Infliction of Emotional Distress**
(against DCF's Damici)

179.    Paragraphs 1 through 139 are incorporated by reference.

180.    The aforementioned actions by defendant Damici were intentional, willful and deliberate and caused plaintiff to suffer from severe emotional distress, which the defendants Damici knew or should have known would have resulted from his actions.

181.    Said conduct was extreme and outrageous; said conduct was the cause of plaintiff's distress; the emotional distress sustained by plaintiff was severe. As a result of defendant Damici's actions, plaintiff suffered damages as set forth above.

**Count Eleven:         Gross deviation from reasonable care**
(against New Milford Police Officers DeLouis and Mullin)

182.    Paragraphs 1 – 139 are incorporated by reference.

183.    Defendants DeLouis and Mullin had a duty to act with reasonable care toward plaintiff. Defendants' submitting a sworn arrest warrant, which material omissions and fabrications after very little investigation constituted gross breaches of said duty from accepted professional standards.

184.    As a result of defendants DeLouis and Mullin's actions, plaintiff suffered extreme humiliation, pain and suffering, terror, mental anguish and depression.

**Count Twelve:         Recklessness**
(against New Milford Police Officers DeLouis and Mullin)

185.    Paragraphs 1 – 139 are incorporated by reference.

186.    Defendants DeLouis and Mullin had a duty to act with reasonable care toward plaintiff. Defendants' submitting a sworn arrest warrant, which material omissions and fabrications after very little investigation constituted reckless breaches of said duty from accepted professional standards.

187.    As a result of defendants DeLouis and Mullin's actions, plaintiff suffered extreme humiliation, pain and suffering, terror, mental anguish and depression.

**Count Thirteen:        Town of New Milford's duty to indemnify Conn. Gen. Stat. § 52-557n**
(against Town of New Milford)

188.    Paragraphs 1 through 139 are incorporated by reference.

189.    Counts Eleven and Twelve are incorporated by reference.

190.    Pursuant to Gen. Stat. § 52-557n, the Town of New Milford is liable for the injuries and losses complained of caused by the negligent acts or omissions of any officer or agent thereof acting within the scope of his employment or official duties, as complained of herein.

**Count Fourteen:      Respondeat Superior Liability for State Law Violations**
(against Town of New Milford)

191.    Plaintiff incorporates by reference paragraphs 1-139, and state law counts 6, 7, 8, 10, 11 & 12.

192.    The conduct of the defendants DeLouis and Mullin alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as New Milford police officers, and/or while they were acting as agents and employees of the defendant Town of New Milford, and, as a result, the defendant Town of New Milford is liable to plaintiff pursuant to the state common law doctrine of respondeat superior.

193.    As a result of the foregoing, plaintiff was deprived of his liberty, and experienced pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damages and injured.

**Count Fifteen:        Indemnification – Conn. Gen. Stat. § 7-465**
(against Town of New Milford)

194.    Paragraphs 1 – 139 are incorporated by reference.

195.    Plaintiff requests indemnification from the Town of New Milford pursuant to Conn. Gen. Stat. § 7-465, and that the Town of New Milford pay on behalf of defendants DeLouis and Mullin to plaintiff for any liability imposed for civil rights violations or damages.

**Count Sixteen:        Gross deviation from reasonable care**
(against DCF's Damici)

196.    Paragraphs 1 – 139 are incorporated by reference.

197.    Damici had a duty to act with reasonable care toward plaintiff. Defendant's substantiations as to both M.M. and S.B. after a woefully inadequate investigation constituted gross breaches of said duty from accepted professional standards.

198.    As a result of defendant Damici's actions, plaintiff suffered extreme humiliation, pain and suffering, terror, mental anguish and depression.

**Count Seventeen:     Recklessness**
(against DCF's Damici)

199.   Paragraphs 1 – 139 are incorporated by reference.

200.   Damici had a duty to act with reasonable care toward plaintiff. Defendant's substantiations as to both M.M. and S.B. after a woefully inadequate investigation constituted reckless breaches of said duty from accepted professional standards.

## V.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment against defendants, as to all causes of action, as follows

1.   Compensatory damages;
2.   Punitive damages as allowed by law;
3.   Interest at the legal rate;
4.   Attorney's fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute or at common law;
5.   Costs of suit incurred herein as authorized by law;
6.   Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**
Plaintiff demands a trial by jury.

**Plaintiff, David Amory**

By:  **/S/**  *Sally A. Roberts*

Sally A. Roberts (#ct24828)
Law Office of Sally A. Roberts, LLC
11 Franklin Square
New Britain, CT 06051
Tel:  860.384.6701
Fax:  860.920.5233
Cell:  860.328.0767
sallyroberts@SallyRobertsLegal.com
www.SallyRobertsLegal.com

## <u>CERTIFICATION</u>

This is to certify that on April 19, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/S/*  *Sally A. Roberts*
Sally A. Roberts (ct24828